733 A.2d 571 (1999)
323 N.J. Super. 490
Rosemary WILLIAMS, Plaintiff-Appellant,
v.
PEMBERTON TOWNSHIP PUBLIC SCHOOLS and Elmer R. Brown and Dr. Robert D. Elder, individually and in their official capacities, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 1999.
Decided July 27, 1999.
*572 Louis C. Rosen, Cherry Hill, for plaintiff-appellant (Patino-Treat & Rosen, attorneys; Mr. Rosen, of counsel and on the brief).
Patrick J. Madden, Haddonfield, for defendants-respondents (Madden, Madden & Del Duca, attorneys; Mr. Madden, of counsel and on the brief).
Before Judges LONG, WEFING and CARCHMAN.
The opinion of the court was delivered by WEFING, J.A.D.
On June 17, 1997, plaintiff Rosemary Williams filed a two-count complaint in which she sought damages for employment discrimination under N.J.S.A. 10:5-12 and for retaliatory discharge under N.J.S.A. 34:19-3. Shortly after defendants filed their answer, they moved for summary judgment. The trial court granted defendants' motion, and plaintiff has appealed. After a careful review of the record, we affirm.
In light of the nature of the questions presented, we consider it important to set forth the factual background of this matter in somewhat more detail than we might otherwise employ. Plaintiff is an African-American woman who was hired by defendant Pemberton Township Public Schools as a guidance counselor for the 1995-96 school year. She was primarily assigned to Fort Dix Elementary School, at which defendant Elmer R. Brown, a white male, is principal. She also spent one day a week at Brotherhood Elementary, another Pemberton-Township school. The record *573 discloses neither the total number of teachers at those schools nor the breakdown of tenured and nontenured teachers; it does reveal, however, that two of Fort Dix's tenured teachers were African-American. Defendant Robert D. Elder is the superintendent of the Pemberton schools; he is a white male.
Plaintiff's relationship with defendant Brown was not entirely amicable. The two met several times to discuss plaintiff's performance and conduct. Their meeting of November 2, 1995, plays a critical role in plaintiff's case. That meeting occurred following an incident that took place earlier that day.
On November 2, plaintiff met with K.D., whose two sons were registered at Fort Dix. Ms. D. asked whether plaintiff met with and counseled her older son, a first-grade student. Plaintiff replied that she recently received a referral from the boy's teacher and had therefore not yet scheduled an appointment. Ms. D. was dismayed; she told plaintiff that she contacted the boy's teacher at the beginning of the school year and asked the teacher to refer her son for counseling because he was experiencing a great deal of stress at home. They had only recently moved to the area and her husband had undergone a severe illness which left him with brain damage. Moreover, she informed plaintiff that her son recently revealed thoughts of suicide. Plaintiff was alarmed by that information and instructed Ms. D. to obtain immediately a professional evaluation of her son's psychological health. Plaintiff completed the necessary paper work and assisted Ms. D. in locating her son for early dismissal.
After assisting Ms. D., plaintiff, believing that the boy's teacher inappropriately responded to a serious situation, notified and met with Brown on November 2. Brown also met with the teacher in question on that day, but the record does not disclose the results of that meeting. Plaintiff alleged that the teacher refused to meet with her to discuss what occurred.
On November 7, 1995, Brown wrote plaintiff a memorandum in which he summarized their meeting of November 2. He referred to their several, performance-related meetings that took place over the past few months and set forth specific areas in which plaintiff's performance needed improvement. Specifically, Brown directed plaintiff to: (1) provide timely feedback to the teachers; (2) pick up the children at their classrooms rather than expect the teacher to keep track of when a particular student was expected to report to guidance counseling; and (3) improve her rapport with the staff. Also in that memorandum, Brown referred to a particular comment he made to plaintiff on November 2. On that day, Brown told plaintiff that she needed to "become more teachable"; he explained to her that he was referring to her inability to receive directions or advice "without giving a retort." He suggested that plaintiff meet with Barbara Greco, the Director of Guidance and Counseling, for assistance in those specified areas.
Several days after receiving Brown's memo, plaintiff met with Ms. Greco. Ms. Greco directed plaintiff to prepare a written response to the four concerns Brown expressed. Within her memo, Ms. Greco noted, "I also need to meet with you to discuss specific rapport complaints Mr. Brown has shared with me." The record contains no information regarding the nature of those complaints.
On November 20, 1995, plaintiff forwarded to Brown a five-page, single-spaced memorandum in response to Brown's November 7 memorandum. She first addressed Brown's complaints concerning her lack of feedback to the faculty; she wrote that she earlier made a policy decision "not only [to] give the teachers who gave me referrals verbal feedback but... also to give them a copy of their referral with comments from me." She noted that "it is my policy to give the teacher feedback as soon as the teacher's *574 and my schedule will allow." She did not include, however, a single example of feedback that she had provided to a teacher in the preceding three months. Regarding her responsibility to pick up a student at the student's classroom, she told Brown that she had begun doing so after he had so instructed her in early September; she included in her memorandum the reasons underlying her desire to have the teacher send the child to the guidance office. She dealt with the issue of rapport by noting that she always ate lunch in the faculty lounge and that she had given three classroom presentations on self-awareness. She provided, however, no specific examples of her individual interactions with staff. Finally, she addressed Brown's comment that she needed to be "more teachable":
I am appalled and offended by your use of this term ... time has long passed since Black people were referred to as "not teachable." It is unbelievable to think that terms like "not teachable" and subservient[1] would exist in anyone's vocabulary in 1995[.]
She concluded her memorandum by listing her activities at the school since September and by expressing dismay at the manner in which she had been treated.
Shortly after receiving plaintiff's November 20 memorandum, Brown revised the text of his November 7 memorandum and requested that the revised memorandum replace the original in plaintiff's personnel file. In its original format, the memorandum read:
In our last meeting, on November 2, 1995, I shared with you that you need to become more "teachable." You reminded me that you have both a B.A. and M.A. degree. I told you it didn't mean you couldn't achieve academically but rather being "teachable" has to do with how you respond when you are given directives and advice. You can't take direction or advice without giving a retort. This is very frustrating to me because as I have told you, all I'm trying to do is to help you succeed as a counselor.
In its revised format, the memorandum read:
In our last meeting, on November 2, 1995, I shared with you that you need to learn to take direction. Taking direction has to do with how you respond when you are given directives and advice. You can't take direction or advice without giving a retort. This is very frustrating to me because as I have told you, all I'm trying to do is to help you succeed as a counselor.
In requesting that the revised version replace the original, Brown wrote to the Assistant Superintendent for Personnel and explained that "[i]t was never my intention to appall or offend Mrs. Williams with my words. It is not part of my character to do that to anyone." The revised version was dated November 7, 1995, clearly marked "Revised," and then placed in plaintiff's personnel file in lieu of the original.
On December 15, 1995, plaintiff was notified that she was being placed on a Plan of Assistance because of her unsatisfactory performance. Ms. Greco outlined six, specific steps plaintiff was to take to improve her performance and provided a time frame for each step. The steps included keeping a daily log of contacts, polling the teachers for certain information, rescheduling certain presentations, and continuing a "mentor-mentee relationship" with a certain individual. The last of Ms. Greco's steps was the following:
[s]taff confrontations will be avoided. You are in the building to provide a service to the students and this can be done most effectively with the cooperation of the staff. Team work with the teaching staff must become a priority.
*575 The record contains no indication whether or how plaintiff attempted to comply with Ms. Greco's directives.
In March 1996, the Pemberton Board of Education (the Board) notified plaintiff that the non-renewal of her contract was scheduled for discussion at its upcoming meeting. On March 28, 1996, the Board voted not to renew her contract. Plaintiff was notified of that decision by letter dated March 29, 1996. The Board's decision set June 30, 1996, as the last day of plaintiff's employment; plaintiff's employment contract was due to expire on that day.
Plaintiff requested an explanation. By letter dated April 4, 1996, the Board explained that she "did not satisfactorily meet the expectations and standards as a Pemberton Township Elementary Guidance Counselor during the 1995-96 school year." Plaintiff then requested a hearing, and the Board complied. Plaintiff appeared at the hearing, accompanied by an attorney and Ms. D. The Board made no change, however, in its decision.
Plaintiff's employment ended with the expiration of her contract on June 30, 1996. Her former position as guidance counselor at Fort Dix and at Brotherhood was immediately filled by another African-American woman. On June 17, 1997, approximately one year after the expiration of her employment contract, plaintiff filed the underlying complaint.
Defendants moved for summary judgment on two grounds. They first contended that plaintiff failed to establish a prima facie case of racial discrimination because she was replaced by an African-American woman. They then argued that the second count of her complaint failed to state a cause of action under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8; according to defendants, the teacher's failure immediately to refer Ms. D.'s son for guidance counseling violated neither a law nor a clear mandate of public policy. In response, plaintiff argued that she was not required to establish as part of her prima facie case that she was replaced by someone outside her protected class and that the serious risk of suicide implicated a clear mandate of public policy. Although she noted in her brief in opposition to summary judgment that discovery had not yet commenced, she failed to demonstrate pursuant to R. 4:46-5 that certain discovery was necessary before summary judgment was appropriately considered. In apparent recognition that the questions presented are purely legal, plaintiff makes no contention on appeal that the summary judgment motion was premature.

I.
We first turn to the question whether plaintiff, replaced by another African-American woman, can establish a prima facie case of racial discrimination. Most analyses of the elements of a prima facie case of racial discrimination begin with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In that case, Green, an African-American mechanic, sued McDonnell Douglas when it discharged him pursuant to a reduction in force and then later refused to rehire him. Id. at 794-97, 93 S.Ct. at 1820-22, 36 L.Ed.2d at 673-75. The Court in McDonnell Douglas was primarily concerned with allocating the parties' respective burdens of proof and production of evidence in a case of racial discrimination. Id. at 800, 93 S.Ct. at 1823, 36 L.Ed.2d at 676. In its opinion, it noted, however, that a plaintiff could establish a prima facie case of racial discrimination
by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
[Id. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.]
*576 Recognizing that it was confronted with only one of a myriad possible discrimination claims, the Court added the following footnote:
The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent (sic) is not necessarily applicable in every respect to differing factual situations.
[Id. at 802 n. 13, 93 S.Ct. at 1824 n. 13, 36 L.Ed.2d at 677-78 n. 13.]
New Jersey courts have generally begun their analyses of the elements of a discrimination claim by turning to McDonnell Douglas and by then making appropriate adjustments in light of the factual underpinnings of the particular plaintiff's claim. Plaintiff contends that her racial-discrimination claim is controlled by the New Jersey Supreme Court's decision in Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 538 A.2d 794 (1988).
In Clowes, the Court recognized the following as the components of a prima facie case:
The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.
[Id. at 595-96, 538 A.2d 794 (quoting Andersen v. Exxon Co., 89 N.J. 483, 492, 446 A.2d 486 (1982)).]
The Court then adopted, for the circumstances presented by Clowes's claim, the prima facie case employed in Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir.1979). Clowes, supra, 109 N.J. at 596-97, 538 A.2d 794. The Loeb court established the following prima facie case for a discriminatory-discharge claim:
that [the employee] ... was in the protected... group, that he was performing his job at a level that met his employer's legitimate expectations, that he nevertheless was fired, and that [the employer] sought someone to perform the same work after [the employee] left.
[Loeb, supra, 600 F.2d at 1014.]
Plaintiff argues that because the Clowes Court failed to require a showing that the plaintiff was replaced by one outside the protected class, she has established a prima facie case. We disagree. Clowes is silent on the question presented here. The Clowes Court concluded that Clowes failed to satisfy his prima facie burden because he failed to establish either his membership in a protected class or his acceptable job performance. Clowes, supra, 109 N.J. at 601, 538 A.2d 794. The Court did not therefore consider whether Clowes satisfied the prima facie test's fourth prong.
We recognize that in Clowes, the Court adopted the elements of a prima facie case for discrimination articulated in Loeb. Id. at 596-97, 538 A.2d 794. We recognize further that the Loeb court refused to hold that a plaintiff was required to show that he was replaced by one outside the protected class as part of the prima facie case. Loeb, supra, 600 F.2d at 1012-14. Although the New Jersey Supreme Court has not directly considered the question, several of the Court's opinions indicate that the Clowes Court did not intend to incorporate that aspect of Loeb. Those opinions, which precede and succeed Clowes, indicate that the Court may indeed, in certain instances, view replacement by an individual outside the protected class as part of a prima facie case of employment discrimination.
Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 61, 389 A.2d 465 (1978), involved a discriminatory, failure-to-promote claim based on gender. Within its opinion, the Court noted that plaintiff, as part of her prima facie case, was "required... to show that similarly situated males were promoted while she was not." Id. at 84, 389 A.2d 465.
*577 In Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432, 435-36, 541 A.2d 1046 (1988), a African-American female assistant professor claimed that she was denied tenure because of discriminatory animus. She first commenced a proceeding before the Division on Civil Rights. Id. at 436, 541 A.2d 1046. The Division found probable cause of gender discrimination because the two professors who received tenure in the year that plaintiff applied were male and possessed qualifications inferior to Dixon's; however, the Division found no probable cause of racial discrimination because the two male teachers were both members of racial minorities. Id. at 438, 541 A.2d 1046. The matter thereafter proceeded as a claim of gender discrimination. Id. at 439, 541 A.2d 1046. The Court chose not to disagree with the Division's analysis.
In Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 549, 569 A.2d 793 (1990), plaintiff, a white male, brought suit for wrongful discharge, gender discrimination, and libel. The Court ruled that he failed to establish the fourth element of a prima facie case of gender discrimination because he
offered no evidence that [defendant] had sought a woman to perform the same work after he left. He relied instead on the fact that prior to his discharge there had been three account executives in the department and at the time of trial there were four. Such a change in personnel, without a more specific showing that [defendant] sought to replace Erickson with ... [a] qualified female account executive is insufficient to satisfy the fourth element of our test.
[Id. at 554, 569 A.2d 793.] Plaintiff attempts to distinguish Erickson by stressing that it involved a claim of reverse discrimination. We consider that distinction immaterial.
Finally, in Bergen Commercial Bank v. Sisler, 157 N.J. 188, 723 A.2d 944 (1999), the Court recognized that in cases of age discrimination brought under New Jersey law, courts have modified the fourth element to require a showing that the plaintiff was replaced with "a candidate sufficiently younger to permit an inference of age discrimination." Id. at 213, 723 A.2d 944 (quoting Kelly v. Bally's Grand, Inc., 285 N.J.Super. 422, 429, 667 A.2d 355 (App.Div.1995)).
Federal courts construing Title VII have similarly struggled with the proper formulation of the fourth element of a prima facie case of discrimination, particularly whether replacement by an individual outside the protected class is a necessary element. Those courts have reached varying results; indeed, in some instances, different panels within the same federal circuit have reached different conclusions. See, e.g., Brown v. McLean, 159 F.3d 898, 905 (4th Cir.1998) (holding that male, replaced by another male, could not make out a prima facie case of gender discrimination), cert. denied, ___ U.S. ___, 119 S.Ct. 1577, 143 L.Ed.2d 672 (1999); Chock v. Northwest Airlines, Inc., 113 F.3d 861, 863 n. 1 (8th Cir.1997) (ruling that it does "not require a plaintiff to demonstrate replacement by a person outside any protected class for a prima facie case"); Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996) (announcing that "[t]hat one's replacement is of another race, sex, or age ... is neither a sufficient nor a necessary condition" to establishing a prima facie case); de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir.1996) (finding that the plaintiff satisfied the fourth prong because he was replaced by one outside of the protected class); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944 (8th Cir.1994) (explaining that "[w]hile proof of replacement by a person outside the protected class will satisfy the fourth element, it is now well-settled that such proof is not required"); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 154 (1st Cir.1990) (holding that a woman claiming discriminatory discharge based on pregnancy does *578 not have to show that she was replaced by a nonpregnant woman); Meiri v. Dacon, 759 F.2d 989, 996 (2nd Cir.) (declaring it "inappropriate" to require an employee to demonstrate that she was replaced by one outside the protected class), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). See generally Elizabeth Clack-Freeman, Comment, Title VII and Plaintiff's Replacement: A Prima Facie Consideration?, 50 Baylor L.Rev. 463 (1998).
The United States Supreme Court has not yet resolved the conflict among the federal circuit courts on this issue, although it addressed it inferentially in O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). In O'Connor, plaintiff alleged age discrimination. Id. at 309, 116 S.Ct. at 1309, 134 L.Ed.2d at 437. Defendant employer argued that plaintiff failed to establish a prima facie case because he was replaced by a forty-year-old individual who thus fit within the protected age group established by the Age Discrimination in Employment Act, 29 U.S.C.A. § 621 to § 634 (the ADEA). Id. at 309-13, 116 S.Ct. at 1309-10, 134 L.Ed.2d at 437. The Court rejected that argument and concluded:
Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.
[Id. at 313, 116 S.Ct. at 1310, 134 L.Ed.2d at 439.]
A fair reading of O'Connor indicates, however, that the Court recognized the unique nature of an age-discrimination claim under the ADEA for the statute defines by age the protected class. Its opinion cannot therefore serve as an indication of how the Court would treat other types of discrimination claims.
In light of the various contexts in which employment discrimination claims arise, we consider it unwise to require a plaintiff to establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class. The appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215 (1981); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir.1996); Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir.1995). That formulation permits a plaintiff to satisfy the fourth element in a variety of ways. Chertkova, supra, 92 F.3d at 91 (setting forth the various ways in which plaintiffs have satisfied the fourth prong).
Under this approach, a showing that a plaintiff was replaced by an individual outside the protected class could support an inference of unlawful discrimination. Similarly, a plaintiff who was replaced by an individual within the protected class but could show other circumstances indicating unlawful discrimination would not be unfairly precluded from presenting a case. For instance, that approach foresees the possibility that an employer, as a defensive measure, may replace a plaintiff with an individual from the plaintiff's protected class after the commencement of litigation. Brown, supra, 159 F.3d at 905-06. That, of course, is not the situation here. When plaintiff's contract expired, she was immediately replaced by another African-American woman. She did not bring suit, however, until nearly a year after the expiration of her contract.
We have examined the record to determine whether there are other circumstances that give rise to the inference that *579 the Board did not renew plaintiff's contract as a result of unlawful discrimination. That examination revealed no such circumstances.
Throughout her argument, plaintiff refers to Brown's use of the word "teachable" and characterizes it as "overtly racial." We do not agree. Brown employed that word to describe a perceived characteristic of plaintiff's personality. Although more appropriate words may have been available (irrespective of the racial or ethnic background of the person to whom Brown was speaking), the word "teachable" does not connote racial animus. To accept plaintiff's characterization is to find a racial overtone in every conversation between a supervisor and an employee of different ethnic or racial backgrounds. It would also permit an individual listener's subjective perception and reaction determine the objective question of the speaker's liability. The law should not find divisions where none exist.

II.
We turn now to plaintiff's claim that the trial court erred in granting defendants' motion for summary judgment on the second count of her complaint. That count was premised upon paragraphs (a) and (c) of N.J.S.A. 34:19-3 of the Conscientious Employee Protection Act (CEPA). The purpose of the statute is to provide protection for workers who may be subjected to retaliatory actions by their employers if they reveal "corrupt, illegal, fraudulent, or harmful activity" by their employers. Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 417, 650 A.2d 958 (1994) (internal quotations and citation omitted).
The second count of plaintiff's complaint alleged that she was terminated in retaliation for her complaints regarding the teacher's failure to refer Ms. D.'s son for counselling in a timely fashion. (Within her appellate brief, plaintiff also contends that she was terminated in retaliation for her complaints regarding discrimination. Plaintiff's complaint evidences no attempt to plead that cause of action. We confine our remarks, therefore, to her allegation that her termination was in retaliation for complaints concerning the D. situation.)
We are satisfied that the trial court properly granted summary judgment. Plaintiff contends that the child's teacher did not properly respond to a child who was exhibiting symptoms that carried a risk of suicide and that the teacher's failure to act was in violation of a clear mandate of public policy for purposes of CEPA. Even if we were to agree with the premise that failing to refer a suicidal student for counseling does violate a clear mandate of public policy, it is not supported by the record.
There is no indication that Ms. D. ever advised her son's teacher, at any time before her meeting with plaintiff on November 2, that her son was contemplating suicide. Plaintiff provides no factual support that such occurred. There is therefore no support for plaintiff's allegations that the boy's teacher was aware of a risk of suicide and ignored it for several months. And, as we noted earlier, plaintiff made no assertion that the lack of discovery hampered her in opposing defendants' motion.
Plaintiff also contends that the teacher's actions in some manner violated the Education of the Handicapped Act, 20 U.S.C.A. § 1400 to § 1491. There is no evidence in the record that the child in question could be considered handicapped within the meaning of that statute. 20 U.S.C.A. § 1401(a)(1).
Because we are satisfied that the trial court correctly granted defendants' motion for the reasons we have stated, we are not called upon to consider the impact, if any, of Higgins v. Pascack Valley Hosp., 158 N.J. 404, 730 A.2d 327 (1999).
Affirmed.
NOTES
[1] Brown did not utilize this word in his November 7 memorandum and the record does not contain any evidence that Brown ever used that word.