**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2320-18T3

DEIRDRE FOREMAN,

    Plaintiff-Appellant,

v.

RAMAPO COLLEGE OF
NEW JERSEY,

    Defendant-Respondent.

_____

Submitted December 16, 2019 – Decided March 9, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6937-16.

Christopher C. Roberts, attorney for appellant.

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Agnes I. Rymer, Deputy Attorney General, on the brief).

PER CURIAM

Plaintiff Deirdre Foreman sued her employer, Ramapo College of New Jersey (Ramapo), alleging she was denied a promotion: (1) because she is African-American, in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42; and (2) in retaliation for issuing a report concluding the college's admissions practices were discriminatory, in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.[1] Foreman appeals the Law Division's orders granting summary judgment in favor of Ramapo and dismissing her claims. For the reasons that follow, we affirm.

I.

We summarize the following facts from the record, viewing "the facts in the light most favorable to [Foreman,] the non-moving party." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (citing R. 4:46-2(c)).

Foreman's Employment at Ramapo

Foreman first became employed by Ramapo in 1998. In August 2014, she was serving as the Associate Director for the college's Educational Opportunity

---

[1] Foreman also made claims for breach of contract and unjust enrichment which were settled prior to this appeal and are not discussed in this opinion.

Fund (EOF)[2] program, when the director of the program unexpectedly died. At the request of the program's supervisor, Dr. Eric Daffron, Vice-Provost for Curriculum & Assessment, Foreman entered into an agreement to serve as Acting EOF Director from September 6, 2014 to April 3, 2015, in consideration for a stipend, representing roughly five percent of her salary. Thereafter, Foreman contends Dr. Daffron advised her that a national search would be conducted to find a permanent replacement for the EOF Director position, and she would not be considered for the job.

After the agreement to serve as the Acting EOF Director had expired, Foreman continued to serve in the temporary position, when, due to a reorganization of Ramapo's departments effective July 1, 2015, the EOF program was placed under the supervision of Chris Romano, Vice-President for Enrollment Management & Student Affairs.

On July 2, Romano emailed Foreman directing her to prepare a report, based on an earlier conversation, "that shows the profile of each incoming EOF class for each of the last three years and where the students came from." A

___

[2] The EOF was established by our Legislature to "identify, recruit and provide financial assistance to needy students who are residents of [New Jersey] in order that they may be able to attend institutions of higher education." N.J.S.A. 18A:71-31(a).

month later, Foreman emailed Romano her report ahead of a meeting to discuss her findings. The report states in pertinent part:

> In comparing the EOF [d]emographic [p]rofile reports from the years of 2006 thr[ough] 2015 the student profiles do not appear to be representative of the mission and intent of the EOF program statewide. Overall there have been significant demographic changes in the profile of students that have been recruited.
>
> . . . .
>
> 2. The [g]ender data indicate[s] that there consistently ha[s] been a greater number of female [accepted students] [as] opposed to males. It appears that there are twice as many females versus male [accepted students] over the course of this time span. With particular attention to the African[-]American and Latino male population[s] th[ese] group[s] continue[] to be underrepresented in the program. There has been a significant decrease in the recruitment of these students and thus they are drastically underrepresented within the EOF program.
>
> 3. The [e]thnic/[r]acial data for the [accepted students] who choose to report indicates a significant change.
>
> . . . .
>
> 4. The [c]ounty data indicates that there has been a significant increase in the number of [accepted students] from Bergen County (the wealthiest county in the state).
>
> . . . .

A-2320-18T3

The remaining counties in New Jersey are significantly lower with numbers in the single digits.

5. The [t]own data indicates that many of the towns from where students are now being recruited are not considered to be economically distressed areas within the [S]tate of NJ.

6. The [h]igh [s]chool data indicates that in more recent years, the high schools from which most [accepted students] are graduating are not in economically distressed areas within the state.

On August 3, Romano thanked Foreman for her report but replied that he was more interested in "an executive summary[,]" asking her what "the big takeaways" from the data were and to identify which "data points illustrate that[.]" He followed up with another email two days later rescheduling their meeting and asking Foreman to supplement her report to include the following:

1.) When we look at the counties and the changes, we need to look at the [enrolled students] number in relation to the total population from the county. For instance, we could say there aren't a lot of EOF students from Middlesex [C]ounty, but there could be few regular students coming from Middlesex as well.

2.) I think we need to look at not just [accepted students] but actual [enrolled students] when it comes to race/ethnicity[.]

3.) For town and high school, I think it would be helpful for you to identify some of the towns that you think are underrepresented so we can do a comparison.

<u>Foreman's Candidacy for the EOF Director's Position</u>

On August 17, Romano reinitiated the search for a new EOF Director, which had previously begun under Dr. Daffron. Romano looked over Foreman's credentials and advised her to apply for the position.[3] Foreman did so.

Ramapo's hiring policy required a search committee to be assembled, "comprised of a diverse representation of units interacting with the position." The guidelines required the search committee to compile an unranked list of at least three candidates, including their respective strengths and weaknesses, and to forward that list to the hiring manager, Romano, who would conduct reference checks and make an offer to the candidate he felt was best for the position. Romano determined he needed to identify a search committee chairperson to manage the logistics of the search and then identify other individuals who "have an in depth knowledge to the search so that you are getting a well[-]rounded perspective on who the best candidate for the position would be."

Romano appointed a search committee chaired by the school's Director for Student Involvement and included: (1) the Dean of the School of Theoretical and Applied Science, who was a long-time and founding faculty member of

---

[3] Foreman was a Ph.D. candidate at the time, but the position only required a bachelor's degree supplemented by a master's degree.

A-2320-18T3

Ramapo; (2) the Financial Aid Liaison to the EOF Program, who participated in determining the financial eligibility of EOF applicants; (3) the Admissions Liaison to the EOF Program, who participated in recruiting and admitting EOF students; (4) a Ramapo EOF senior; and (5) the Coordinator of Ramapo's First Year Experience Program. The committee, which was approved by the college's Office of Affirmative Action, was comprised of two white males, two Hispanic females, one white female, and one Hispanic male.

The search committee conducted a round of telephone interviews and identified four candidates who were invited to campus for in-person interviews and presentations. Foreman was not among the candidates chosen for a second round of interviews, but Romano directed the search committee to add her to the list given her long service to the program and her experience as Associate Director.

After completion of the five in-person interviews and presentations, the committee recommended three unranked finalists to Romano, with Foreman not among them. Barbara Harmon-Francis, an African-American woman, one of

the final three candidates, was ultimately offered the position by Romano, which she accepted.[4]

Foreman's EEOC Complaint and Investigation

After Foreman was told she was not the successful candidate she went on extended leave and thereafter filed a complaint with the Equal Employment Opportunity Commission (EEOC), alleging the search committee had been stacked against her and she was discriminated against.

To support her claim, Foreman included an email from Ramapo faculty member Michelle Johnson alleging "the search committee was stacked with individuals who wanted a fresh perspective for the EOF program," pointing out that "[s]earch [c]ommittees receive instruction/direction from the [h]iring [m]anager," and in this case the hiring manager was Romano. Johnson also stated in the email that an unnamed student member of the search committee told her "(1) [Foreman] was not liked by the EOF students; (2) [Foreman] did

---

[4] Harmon-Francis had previously worked in the EOF program at Rutgers University. When asked about her qualifications compared to Foreman's, Romano stated that while they previously held different job titles, their work experience did not differ much.

not submit [an] application for the position; and (3) [Foreman] was allowed to interview for the position, but really was not a viable candidate."

The student committee member, Monica Cuello,[5] identified Johnson as her sorority's faculty advisor whom she would seek advice from "pretty often." Cuello denied telling Johnson that Foreman was not liked by the EOF students, but instead told her the students did not like the program changes that occurred when Foreman became Acting EOF Director. Cuello also denied telling Johnson that Foreman did not submit an application or that she was not a viable candidate.

Cuello further described the EOF program as "[v]ery family oriented" until the death of the EOF Director, but when Foreman took over "it wasn't as united." She said the program "was very disorganized and a lot of people, a lot of staff were leaving, so a lot of people didn't have guidance during that period. It was very transitional." Cuello also said she thought it would be helpful to have a father figure in the office.

---

[5] Cuello was selected to serve on the committee because another EOF female student declined to serve due to her busy work schedule. Romano indicated he selected Cuello for the search committee because the EOF program regularly highlighted her for academic achievement, and he thought she would be a great representative of the EOF student population.

As part of the EEOC investigation, an interview of search committee member Jose Vallejo, Admissions Liaison for the EOF program, was detailed in a report.[6] Vallejo acknowledged Foreman's note taking ability, and revealed he was once approached by Foreman's predecessor to discuss the lack of diversity in the EOF's recruitment efforts. In addition, when asked if he perceived militancy from Foreman, Vallejo offered:

> [O]ften her dress and hairstyles may cause some persons to draw a conclusion. To some people it may come across as "militant". To [me] it is working with the audience you have.
>
> . . . .
>
> "Do I think that [Foreman] would have made a great Director I don't know." [I]n the [phone] interview, she came across as nervous and chatty. Many members felt that some of the questions were not answered.
>
> . . . .
>
> "[Foreman's] strengths was [sic] working with students and maybe the administrative side is not her strength."

---

[6] Romano stated he chose Vallejo for the committee because he was responsible for recruiting every student that applies to the program. Vallejo was also a Ramapo EOF graduate, which gave him intimate knowledge of the program.

Foreman's Lawsuit & Dismissal

Foreman alleges she was discriminated against based on her race in violation of the LAD and was unlawfully retaliated against in violation of CEPA. Ramapo moved for summary judgment on both claims and the motion judge issued an order and written decision on December 7, 2018, granting summary judgment in part by dismissing Foreman's LAD claim but denying summary judgment on her CEPA claim.

In regards to the LAD claim, the judge found the usual burden shifting analysis required by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) was not controlling because "the person[, Harmon-Francis,] chosen for the position allegedly at [p]laintiff's expense due to racial discrimination was a similarly situated person, that is, an African[-]American woman." The judge determined that because the McDonnell Douglas test did not apply, Foreman was required by Williams v. Pemberton Twp. Pub. Schs., 323 N.J. Super. 490 (App. Div. 1999), to present facts overcoming the presumption of non-discrimination. The judge continued that the only factual scenario with any merit would be if Ramapo hired another person in the same class as Foreman to disguise discrimination against her. But the judge found that she failed to

establish those facts by only arguing she was discriminated against because she was allegedly more qualified for the position than Harmon-Francis.

Regarding the CEPA claim, the judge noted that in order for Foreman to establish a prima facie retaliation claim under N.J.S.A. 34:19-3(a)(1), she must show:

> 1. That she reasonably believes that her employer's conduct was violating either a law, or regulation promulgated pursuant to law;
>
> 2. that she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(a);
>
> 3. that an adverse employment action was taken against her; and
>
> 4. that a causal connection exists between the whistle-blowing activity and the adverse employment action.

Ramapo challenged Foreman's evidence as to the second and fourth elements. The court, discussing the second element, found the emails between Foreman and Romano "viewed in the light most favorable to [p]laintiff, support that [she] was complaining not only of a violation of a public policy but of a failure to adhere to admissions criteria under [N.J.A.C. 9A-11.2.2(b)]." The judge, however, did not address the fourth element – the causal connection between Foreman's emails to Romano and the alleged bias of the search committee.

A-2320-18T3

Picking up on this shortcoming, Ramapo filed a motion for reconsideration on December 12, requesting argument on short notice due to the pending January 7, 2019 trial date. The motion was scheduled for December 21, the only scheduled motion day before the trial date.[7] The same day Ramapo filed its motion for reconsideration, the court contacted Foreman's counsel by leaving a voicemail directing that opposition be submitted as soon as possible. Foreman filed her opposition the next day on December 13, in order to comply with "the [eight] day requirement with a December 21 . . . return date." She did not object to the judge deciding the motion on short notice.

On December 21, after hearing argument, the judge granted summary judgment in favor of Ramapo and dismissed Foreman's CEPA claim, stating:

> I don't think a rational juror could find, taking the facts and inferences in the light most favorable to [p]laintiff that . . . there was, in fact, the animus there. The causal connection . . . doesn't exist. The search committee acted independently of Mr. Romano in the sense of doing what they did, did not have knowledge of the whistle blowing. The allegation of stacking [the search committee] just doesn't stand up to what . . . I think a reasonable jury could find. It's just haphazard facts and disparate facts joined together to try to build a foundation which I don't think exists.

This appeal ensued.

---

[7] Due to the court's holiday recess, there was no motion day on January 4, 2019.

II.

Before addressing Foreman's arguments contesting summary judgment dismissal of her LAD and CEPA claims, we discuss the well-established principles governing our review of a trial judge's summary judgment order.

We review a ruling on a summary judgment motion de novo, applying the same standard governing the motion court. N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 452 (App. Div. 2019) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Our court rules provide that a motion judge should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In deciding whether a genuine issue of material fact exists, "the motion judge must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). However, this court owes "no deference to the motion judge's

conclusions on issues of law." Bove v. AkPharma Inc., 460 N.J. Super. 123, 138 (App. Div. 2019) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A.

Considering these principles, we turn first to the dismissal of Foreman's LAD claim. She contends the motion judge erred in determining racial discrimination could not have occurred because the person Ramapo selected to fill the EOF Director's position is of the same protected class as Foreman, an African-American woman. Citing Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492 (1982), Foreman contends she established a prima facie case of racial discrimination under McDonnell Douglas, 411 U.S. at 802. Foreman argues Ramapo hired an African-American woman to insulate itself from a race discrimination claim, and that racial discrimination occurred because Ramapo hired "an objectively less qualified black woman . . . solely because of her race."

To establish a prima facie case for a failure to hire or promote under the LAD, a plaintiff must show, by a preponderance of the evidence that she "(1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the

employer continued to seek applications for persons of plaintiff's qualifications." Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210 (1999) (internal quotations removed) (citing Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550 (1990)). Once a prima facie case is established, a presumption of discrimination arises and the burden then shifts to the defendant to show a "legitimate, non-discriminatory reason" for its employment action. McDonnell Douglas, 411 U.S. at 802; see also Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005). The plaintiff must then show that this reason is merely a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804.

As to the fourth element, we find instructive Williams, 323 N.J. Super. at 501. There, the plaintiff, who was an African-American woman, filed LAD and CEPA claims against her employer after her teaching contract was not renewed due to unsatisfactory performance. Id. at 492, 496. The plaintiff was immediately replaced by another African-American woman. Id. at 497.

In making our analysis on the LAD claim, we stated, "New Jersey courts have generally begun their analyses of the elements of a discrimination claim by turning to McDonnell Douglas and by then making appropriate adjustments in light of the factual underpinnings of the particular plaintiff's claim." Id. at 498. Our courts and the federal courts have similarly struggled with the fourth prong,

16

"particularly whether replacement by an individual outside the protected class is a necessary element." Id. at 501. We concluded it is

> unwise to require a plaintiff to establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class. The appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination.
>
> [Id. at 502 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).]

In this case, we conclude there is no dispute that Foreman satisfied the first three elements of the test to establish a prima facie case of discrimination. Thus, we must determine whether she satisfies the fourth element of the test, thereby shifting the burden to Ramapo to show its hiring decision was based on legitimate, non-discriminatory reasons. We need look no further than the motion judge's explanation in granting summary judgment to conclude that, considering the facts in the light most favorable to Foreman, she has not satisfied the fourth element of the test.

The judge reasoned that because an African-American woman was ultimately hired for the position, no presumption of discrimination arose, as it

otherwise would have if Foreman had met her prima facie burden under the

McDonnell Douglas test.  The judge continued:

> In order for [Foreman] to rebut the presumption of non-discrimination, [she] must establish "a logical reason to believe that the decision rests on a legally impermissible ground," such as race discrimination. Carson v. Bethlehem Steel Corp., 82[ ]F.3d 157, 159 (7th Cir. [19]96); Williams[,] 323 N.J. Super. 490 . . . .
>
> The one ground potentially applicable to the factual scenario herein is that Ramapo . . . hired another person in the same class to disguise discrimination against [Foreman]. See Miles v. Dell, Inc., 429 F.3d 480 (4th Cir. 2005). [Foreman] bears the burden, on a summary judgment standard . . . to establish this. Here, [Foreman's] argument in opposition to the LAD claim . . . centers on the claim that the person hired . . . was less qualified.
>
>    . . . .
>
> Counsel for [Foreman] advocates that the McDonnell Douglas . . . burden shifting analysis applies. Yet, as noted supra, such is not the case.
>
>    . . . .
>
> Even taking all reasonable inferences in the light most favorable to [plaintiff], [she] has not presented any facts to establish a discriminatory or biased search process.
>
>    . . . .
>
> When one analyzes the proffered reasons by [Foreman] as to bias on the part of . . . Vallejo and . . . Cuello, they

18

> do not rise beyond suspicio[n] and innuendo and are not competent facts. Whether or not . . . Cuello preferred a male, the facts demonstrate that a woman was hired. The claim of [Foreman] as to . . . Vallejo – some may view [Foreman] as militant – does not demonstrate that this was Mr. Vallejo's view nor that it in any way impacted the search process.

Accordingly, summary judgment dismissal of Foreman's LAD claim was appropriate because, as a matter of law, Foreman failed to establish a prima facie case of racial discrimination.

### B.

Ramapo's summary judgment motion to dismiss Foreman's CEPA claim was initially denied by the judge but was subsequently granted on its reconsideration motion. Foreman maintains the judge gave her insufficient time to oppose the reconsideration motion and misapplied the law in reaching his decision. We first address her procedural contentions, then her substantive arguments.

### 1. Time Given to Oppose Reconsideration Motion

Foreman contends she was prejudiced when the judge decided to hear Ramapo's reconsideration motion on short notice without any rational reason. She was directed by the judge to file her opposition "as soon as possible because oral argument" was scheduled nine days later. She did so without objection.

She now claims she did not have enough time to adequately respond. She also maintains the judge gave no rational explanation for the truncated process, thereby constituting an abuse of discretion.

Because Foreman did not seek additional time to submit her opposition to Ramapo's reconsideration motion, and did not contend before the motion judge that she was prejudiced because she needed more time to submit opposition, we will not consider her contentions raised for the first time before us as they do not "'go to the jurisdiction of the trial court or concern matters of great public interest.'" Zaman v. Felton, 219 N.J. 199, 226-27 (2014) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)). Nevertheless, for the sake of completeness, our consideration of her arguments establishes they have no merit.

Under Rule 1:6-3(a), the return date of Ramapo's reconsideration motion would normally require sixteen-day notice "unless otherwise provided by court order . . . ." (Emphasis added). Moreover, requiring Foreman to submit her opposition "as soon as possible because oral argument" would be held nine days later, at the only available motion date before the scheduled trial date, was within the judge's authority. The same rule provides, "any opposing . . .

objections . . . shall be filed and served not later than [eight] days before the return date <u>unless the court relaxes that time</u>." <u>Ibid.</u> (emphasis added).

Recognition of the judge's authority to alter a motion's return date and the submission of opposition was thoroughly addressed by our Supreme Court in <u>Lombardi v. Masso</u>, 207 N.J. 517, 534-37 (2011), where it held:

> It is well established that "the trial court has the inherent power to be exercised in its sound discretion, to review, revise, reconsider and modify its interlocutory orders <u>at any time</u> prior to the entry of final judgment." <u>Johnson v. Cyklop Strapping Corp.</u>, 220 N.J. Super. 250, 257 (App. Div. 1987) (emphasis added). <u>See</u> <u>also</u> <u>Marconi Wireless Telegraph Co. of Am. v. United States</u>, 320 U.S. 1, 47 (1943) (finding trial court has "power at any time prior to entry of its final judgment . . . to reconsider any portion of its decision and reopen any part of the case"). That power, which is rooted in the common law, <u>see</u>, <u>e.g.</u>, <u>Lyle v. Staten Island Terra–Cotta Lumber Co.</u>, 62 N.J. Eq. 797, 805 (E & A 1901), is broadly codified in <u>Rule</u> 4:42–2, which provides expansively that "any order . . . which adjudicates fewer than all the claims as to all the parties shall not terminate the action as to any of the claims, and it shall be subject to revision <u>at any time</u> before the entry of final judgment in the sound discretion of the court in the interest of justice." (Emphasis added); <u>see</u> <u>also</u> <u>R.</u> 1:7–4(b) ("Motions for reconsideration of interlocutory orders shall be determined pursuant to <u>R.</u> 4:42–2."). That <u>Rule</u>, like the jurisprudence on which it is based, sets forth no restrictions on the exercise of the power to revise an interlocutory order.
>
> Thus, for example, the stringent constraints imposed on final judgments and orders under <u>Rule</u> 4:50–1 (grounds

21

for relief from judgment) are wholly inapplicable to interlocutory orders. See Johnson, [. . .] 220 N.J. Super. at 257–64 (tracing history of Rule 4:50–1 and declaring its "strict and exacting standards" do not apply to interlocutory orders); see also R. 4:49–2 (permitting reconsideration of final judgments or orders within 20 days of entry). Indeed, "[a] significant aspect of the interlocutory nature of an order is its amenability to the trial court's control until entry of final judgment without interposition of considerations appropriate to finality." Pressler & Verniero, Current N.J. Court Rules, [cmt.] 3 on R. 4:42–2 (2011) (citing Ford v. Weisman, 188 N.J. Super. 614 (App. Div. 1983)).

. . . .

Although the rule is expansive, the power to reconsider an interlocutory order should be exercised "only for good cause shown and in the service of the ultimate goal of substantial justice." Johnson, . . . 220 N.J. Super. at 263-64[.]

. . . .

Procedurally, where a judge is inclined to revisit a prior interlocutory order, what is critical is that he provide the parties a fair opportunity to be heard on the subject. It is at such a proceeding that the parties may argue against reconsideration and advance claims of prejudice, e.g., missing witnesses, destroyed evidence. Moreover, once the judge has determined to revisit a prior order, he needs to do more than simply state a new conclusion. Rather, he must apply the proper legal standard to the facts and explain his reasons.

We conclude the judge did not misapply his discretion in the amount of time he afforded Foreman to oppose Ramapo's reconsideration motion. We

discern no prejudice to Foreman given the fact the judge was being asked on reconsideration to analyze the fourth element of Foreman's CEPA's claim – whether Foreman showed causality between her alleged whistleblowing and Ramapo's alleged retaliation – that was omitted when he initially denied summary judgment dismissal of the claim. This element had already been briefed by Foreman in her opposition to summary judgment, so it was not as though she was being asked to research and argue a new point of law. Further, Foreman's silence in objecting to the judge's request to submit her opposition "as soon as possible," and her submission the <u>very next day</u> undermines her claim of prejudice before us. Hence, there was nothing irrational regarding the schedule the judge set for Ramapo's reconsideration motion.

2. <u>Reconsideration Motion Decision</u>

Foreman contends the motion judge erred in determining that she did not satisfy CEPA's fourth element in order to avoid summary judgment dismissal of her CEPA claim.[8] She cites to <u>Estate of Roach v. TRW, Inc.</u>, 164 N.J. 598, 612 (2000) (citing <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 284 N.J. Super.

---

[8] Foreman also argues the motion judge erred in granting Ramapo's motion for reconsideration because he applied a summary judgment standard of review instead of the standard used for reconsideration under <u>D'Atria v. D'Atria</u>, 242 N.J. Super. 392 (Ch. Div. 1990).

543, 550 (App. Div. 1995)), which held a causal connection between a whistleblowing activity and an adverse employment activity may be inferred "based on the surrounding circumstances." She maintains she presented evidence of a causal connection between her whistleblowing activity, disclosure of Ramapo's discriminatory admissions, and the failure to promote her to EOF Director. According to Foreman, Romano had a negative disposition toward her candidacy due to her report of the college's discriminatory admissions practices that can be imputed to the search committee, which he assembled.

In support, Foreman argues we should look to the persuasive reasoning in Shager v. Upjohn Co., 913 F.2d 398 (7th Cir. 1990). There, the plaintiff had not been fired by his supervisor, but by a "Career Path Committee." Id. at 400. The plaintiff alleged that the committee's decision had been tainted by the supervisor's prejudice and that the committee's deliberations had been brief and perfunctory. Id. at 405. The Seventh Circuit held that if the committee acted as a conduit of the supervisor's "prejudice–his cat's paw–the innocence of its members would not spare the company from liability." Ibid.

According to Foreman, a causal connection can be inferred using a "cat's paw" theory because Romano's bias against her due to her report of discriminatory admissions practices can be imputed to the search committee

24                                            A-2320-18T3

which Romano assembled. In fact, Foreman maintains the motion judge understood her causal connection contention when during summary judgment argument he inquired, "[d]id they stack the deck basically," while attempting to parse out the evidence which supported her claims of LAD or CEPA.

Based upon our examination of the record, there is no indication that Romano was upset with Foreman's findings. His email communications reflect only that he was looking for an executive summary and wanted her to supplement her report by examining the number of minority high school students in a particular county, not just the number of minority high school students admitted into the EOF program. Nonetheless, even if we agree with Foreman's theory that Romano was upset about her findings, there is no direct or circumstantial evidence indicating any of the search committee members knew about Foreman's report or her email communications with Romano regarding the underrepresentation of African-American and Latino male students in the EOF program. In addition, she has not shown that Romano assembled the search committee with the intention that it would be biased against her.

Foreman's reliance on <u>Shager</u> is misplaced because in that case the supervisor directed the committee to fire the plaintiff, <u>id.</u> at 400, and here, there is no evidence Romano directed the committee not to recommend Foreman for

25

the EOF Director's position. To the contrary, the record suggests the opposite. Romano encouraged Foreman to apply for the position and he directed the search committee to add her to the list of second round candidates when it had not initially selected her. And there is no proof Romano employed some sort of Machiavellian theory to get back at Foreman through the hiring process due to her criticism of the college's admission practices. There is no evidence Romano had Foreman apply to the EOF Director's position and then used the committee members as his pawns, directing them to reconsider her candidacy then not select her as a cover for his mission to retaliate against her.

In short, Foreman did not satisfy the fourth element of a CEPA claim because the record reveals no evidence that Romano's alleged animus towards Foreman, due to her claimed whistleblowing, caused the search committee not to recommend her for the EOF Director's position. Thus, summary judgment dismissal of her CEPA claim was consistent with the law.

Any argument made by Foreman that we have not expressly addressed is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION